THE NEW YORK AND LONG BRANCH RAILROAD COMPANY and THE PENNSYLVANIA RAILROAD COMPANY, appellants,

*v.*

THE ATLANTIC HIGHLANDS, RED BANK AND LONG BRANCH ELECTRIC RAILWAY COMPANY et al., respondents.

Under the act of March 22d, 1895 (*Gen. Stat. p. 2717*), the chancellor cannot impose upon the company whose steam railroad is to be crossed at grade by an electric railroad, the duty and responsibility of operating a derailing switch in the line of the electric railroad.

On appeal from a decree of the chancellor in the matter of
the Atlantic Highlands, Red Bank and Long Branch Electric
Railway Company, who delivered the following opinion :

The statute (*P. L. of 1895 p. 462*) contemplates that where
the route of a steam or electric railway shall cross an established
steam railway outside of a city, the intended crossing shall be
constructed so as to inflict as little injury as possible to the rights
of the existing railway, and so as to afford proper protection to
the public ; also that before the crossing shall be constructed the
new railway company shall apply to the chancellor to define the
mode of crossing, whereupon the chancellor shall cause notice of
the application to be given to the municipality in which the
crossing is to be located and to the company whose railway is to
be crossed, and then proceed, by his decree, to define the mode
in which the crossing is to be made.   He is expressly enjoined
to avoid a grade crossing, if, in his judgment, it be reasonably
practicable to do so and the public safety so requires.

Under this statute, application has been made to me in behalf
of the Atlantic Highlands, Red Bank and Long Branch Electric
Railway Company, to define the mode of its crossing the rail-
way of the New York and Long Branch Railroad Company,
where, on grade, the latter railway intersects the junction of
Bridge avenue and Monmouth street, in the town of Red Bank.

It is proved that more than ninety trains daily pass over the
New York and Long Branch railroad at that point, several of
them at high rates of speed and without stopping, and also that
immediately southeast of this crossing the railroad depot of Red
Bank, used by the New York and Long Branch and New Jersey
Southern railroads, to which, every day through the summer
months, a large number of carriages and wagons are driven, is
situated.   The depot is the third in importance on the New
York and Long Branch railroad.   The centre is undoubtedly a
busy one, and the proposed crossing at grade, if insufficiently
safeguarded and managed, will unquestionably, when subjected
to additional use by an electric railway, be one of considerable
danger.

Regarding these conditions, I am satisfied that public safety will be best subserved by a crossing constructed either over or under the New York and Long Branch railroad, because either of those methods of crossing will afford practically absolute security, principally for the reason that their safe use will depend only in the slight measure which timely repairs may require upon human agency.

The question which has occasioned me some perplexity, and the answer to which controls my conclusion, is whether an overhead or undergrade crossing is " reasonably practicable," in view of the expense it will occasion and the injurious encumbrance the first named of them, if adopted, will be to the town.

The plans of engineers show that the overhead crossing will be an unsightly affair and, unless built at a very considerable expense, will dangerously obstruct the street on which it will be erected, and, whether expensively or otherwise constructed, will almost impassably encumber that street at the termini of the required structure.

An undergrade crossing will require change in grades of two streets and involve not only an expenditure of between sixty and seventy thousand dollars in the work, but also the payment of damages to the owners of the property which borders upon these streets. Besides a depression of the streets at this point will materially interfere with facility of approach from the street to the steam railroad depot and will thereby work considerable inconvenience to the public.

The representatives of the steam railroad call my attention to the fact that a short distance from the Monmouth street crossing the steam railroad now crosses Front street, a highway which is parallel to Monmouth street and a short distance north of it, by an overhead bridge, and that by changes of grade and the acquirement of a little property for additional right of way at inconsiderable expense, a perfectly safe undergrade crossing for the electric railway can be had there. The steam railroad offers to make substantial contribution towards the expense of grading if crossing be had at this point and to build a new bridge for its road which will amply accommodate the proposed electric

railway crossing. I have studied the plan proposed for this crossing and am satisfied that it is not only entirely feasible, but also is most desirable for public safety. The objection to my adopting it is that it is not within the chosen route of the electric railway, the route which the municipal authorities of Red Bank have deliberately sanctioned by ordinance after having their attention called to Front street as the safest crossing. Now I am confronted not only with the establishment of this route by the concurrent action of the town and the electric railway company, but also by the opinion and judgment of the authorities of the town, evinced by their ordinance, that the electric railway crossing over the steam railroad should be made at grade. Of course, such expression of opinion does not bind me, but its influence as the mature judgment of the municipal authorities, who must be assumed to be familiar with the location and to have acted in sincerity for the welfare and safety of the public, cannot be without weight in my consideration; yet I am so strongly convinced that the crossing should have been located at Front street that I am satisfied that I would fix it there if I had the power to do so. But I have not that power. It is true, I perhaps might indirectly accomplish the change by deciding upon the most expensive method of crossing, as was suggested by one of the counsel of the steam road, but it is remembered that the determination which is required of me is, first, whether an undergrade or an overhead crossing within the route selected is "reasonably practicable" and required for public safety, and second, what method and safeguards in crossing shall be observed. The statute does not contemplate that I shall prescribe any change in the route of an electric road. The answer to the proposition of counsel is that it would be a sacrifice of the integrity of my judgment upon the questions submitted to use it in any manner to secure by indirection a preferable crossing outside of the established route of the electric railway. If I were called upon to assent to the route, as were the municipal authorities, I could enforce the Front street crossing.

The question of expense as an element in the definition of the reasonable practicability of the undergrade or overhead

crossing is dependent, in some measure, upon public safety, for if no other crossing will subserve that safety, expense becomes an insignificant element in the definition. And so, on the other hand, if public safety may be secured in a crossing at grade, the reasonable practicability of the other crossings is in a considerable measure determined by a comparison of their expense with the expense of a safe grade crossing.

It is in testimony that there is an invention by which an operator in a tower, by mechanical signals, can warn the electric car of the approach of a steam train and, at the same time, raise upon the electric railway track an impediment called a " scotch-block," which will stop the electric car, or turn a switch which will derail it, if its motorman disobeys the signals, and, at the same time, also will deprive the motor of the electric current which furnishes its motive power. The mechanism is so arranged that when the way for the electric car is open, danger signals, at proper distances, are exhibited on the steam railway.

In the hands of a careful operator this contrivance appears to afford abundant security. The main objection to it is the watchful care it requires of human agency.

It is insisted that risk of accident may be reduced still further by the additional requirement that no electric car shall cross the steam road before it shall have first stopped some seconds, and until its conductor shall have gone upon the steam tracks and have ascertained that the car may safely proceed. It may be doubted whether this additional precaution is not objectionable in that it may lead to carelessness between the conductor and signalman in the tower, by encouraging the one to be dependent upon the other, or by opening the door to accident by taking the conductor from the care of the trolley which runs upon the power wire, which, by jolting on the rails of the steam road, may be thrown from the power wire, as was lately the case in this state, and leave the electric car upon the steam railway tracks without motive power. The electric railway company offers this double precaution, and I, however, incline to adopt it, provided the towerman be the employe of the steam road, subject to its control and discipline. I think that it presents a

fairly safe scheme for crossing at grade, and, in view of it, I am constrained to adjudge that if it be adopted the overhead and undergrade crossings which are available at the point in question, costing $100,000 or thereabouts, should be deemed, reasonably speaking, as impracticable.

I will order that if, before it constructs a crossing, the electric railway company shall give bond to the steam railway company, with sufficient surety or sureties, in the penal sum of $5,000, conditioned to pay at stated periods the reasonable salaries of competent towermen employed by the steam road, and such other expenses as shall be necessary to the efficient maintenance and management of the signals and cut-offs mentioned, during the continuance of said crossing, and shall completely erect the "Gibbs" signal system, including the power cut-off and the scotchblock or derailing switch, and place it in control of the steam railway, it shall be permitted, when it shall have complied with all other legal and lawfully-required conditions precedent to give it the right to cross, to cross at grade by proper crossings put in place at such time of the day or night, and in such manner as the steam road may designate as least injurious to it, and thereafter to use said crossing in the exercise of the double precautions referred to. The steam railroad now maintains gates at this crossing. Those gates will, of course, remain, and will be a third safeguard. The electric company must bear whatever expense shall be necessary to adapt those gates for continued use after their wires shall be erected.

On March 22d, 1895, the following statute was enacted :

## "CHAPTER CCXLI.

"An act to regulate the crossing at points not within the limits of cities of this state, of steam railroads by steam or electric railroads hereafter to be constructed.

"1. BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey,* That whenever the route of any steam or electric railroad hereafter to be constructed shall cross at points outside of the limits of cities the line of any steam railroad in this state, such crossing shall be made in such a way as will inflict the least injury upon the rights of the company owning or operating the

railroad to be crossed, and as will afford proper protection to the public; and no company shall hereafter construct any steam or electric railroad across the line of any steam railroad, except within the limits of a city, until it shall have first made application to the chancellor of this state to define the mode in which such crossing shall be made; and it shall thereupon be the duty of the chancellor, after causing reasonable notice of such application to be given to the municipal authorities, and also to the corporation owning or operating the railroad intended to be crossed, to define by his decree the mode in which such crossing shall be made; and if, in his judgment, it is reasonably practicable and public safety so requires to avoid a grade crossing, he may, in his discretion, by his decree define and regulate the mode and manner of such crossing, and thereupon such crossing shall be made in the mode defined by such decree, and in no other way."

In July, 1896, the Atlantic Highlands, Red Bank and Long Branch Electric Railway Company, claiming that the route of its electric railroad crossed the line of the steam railroad of the New York and Long Branch Railroad Company within the lines of Monmouth street, in the town of Red Bank, presented to the chancellor a petition, praying that, in accordance with the statute above recited, he would " define the mode in which such crossing should be made." On filing the petition notice was given to the appellants, and, after the taking of testimony, the chancellor decreed that a grade crossing must be made in the mode pointed out in the decree, and therein further ordered as follows:

" *Sixth.* And for the better assurance of safety in the grade crossing aforesaid, the electric company shall, at its own expense, provide and completely erect at the crossing in question a tower suitable for the construction and operation of the system known as the 'Gibbs' signal system, and equip such tower with the said 'Gibbs' signal system, which system shall include the power cut-off and the derailing switch for the purpose of depriving the electric cars of motive power and bringing them to a standstill while cars are passing on or about to pass upon said steam railroad. The mechanism of such system shall be so arranged that when the way for the electric car is open, danger signals at one thousand feet in each direction from said crossing shall be exhibited on said steam railroad, which signals shall be so maintained until the electric car shall have passed over such crossing, such system to be constructed according to the plans hereto annexed and made a part hereof. After the construction and completion of said tower and signal system, and as a condition precedent to the right of said electric company to cross the tracks of said steam railroad, the electric company shall place said tower and signal

N. Y. & Long Branch R. R. Co. *v.* Atlantic Highlands &c. Ry. Co.

system in the control of said steam railroad, and shall also, before it constructs such crossing and annually thereafter, give bond to the said steam railroad, with sufficient surety or sureties, in the penal sum of five thousand dollars,. conditioned to pay at stated periods the reasonable salaries of such competent. men as the steam railroad may employ in the operation of said system, and' such other expenses as shall be necessary to the efficient maintenance and management of the signals and cut-off hereinbefore mentioned, during the continuance of said crossing."

The appellants insist (*inter alia*) that so much of the decree as places upon the steam railroad company the duty and consequent responsibility of operating the " Gibbs signal system," is beyond the authority conferred by this statute upon the chancellor.

*Mr. Alan H. Strong*, for the appellants.

*Mr. James E. Degnan* and *Mr. Charles L. Corbin*, for the respondents.

The opinion of the court was delivered by

Dixon, J.

It is unnecessary now to consider whether the legislature, in the exercise of its police power, could impose upon the steam railroad company the duty of taking any precautions for the safety of the electric cars and their occupants while crossing the steam railroad within the limits of the public highway, beyond' such precautions as were required for the safety of travelers using the highway in customary modes, without making compensation to the steam railroad company for the additional expense.    It is also unnecessary now to consider whether, if such compensation be constitutionally required, the electric railroad company possesses legislative authority to have its amount determined and paid, against the will of the steam railroad company.

At present it is enough to say that we can discover in this statute, which, with regard to a grade crossing, empowers the chancellor only " to define the mode in which such crossing shall

be made," no warrant for imposing upon the steam railroad company the duty of operating the electric railroad in any particular.

If this decree should be enforced, the steam railroad company would become responsible to the electric railroad company, its employes and passengers and to all other travelers, for injury happening to them through the negligence of the persons in charge of the derailing switch, for those persons are to be employes of the steam railroad company, and yet that switch is a part of the electric railroad and not of the steam railroad. The right to impose such a responsibility upon the company whose railroad is to be crossed cannot fairly be brought within the terms or intendment of this statute.

In this respect the decree is illegal, and as the scheme devised by the chancellor is an entirety, the decree must be wholly reversed.

*For reversal*—THE CHIEF-JUSTICE, DIXON, GARRISON, GUMMERE, VAN SYCKEL, HENDRICKSON, NIXON—7.

*For affirmance*—DEPUE, LIPPINCOTT, LUDLOW, BOGERT—4.